MRS. VIRGIE BELL, Plaintiff in Error, v. SEARS, ROEBUCK & COMPANY, Defendant in Error. —428 S.W.2d 646.

Western Section. February 28, 1968.

Certiorari Denied by Supreme Court May 20, 1968.

Charles E. Maness, Union City, for plaintiff in error.

C. W. Miles, III, Union City, Miles & Miles, Union City, of counsel, for defendant in error.

JACK MANHEIN, Special Judge. This case arose out of a fire which occurred in the home of Mrs. Virgie Bell in Union City. Mrs. Bell brought an action for damages for injury to her property against Sears, Roebuck & Company. The parties will hereinafter be designated as they appeared in the trial court—Mrs. Bell as plaintiff and Sears as defendant.

The Circuit Court heard the case without a jury, then entered a judgment dismissing plaintiff's suit. Plaintiff prayed and perfected an appeal. We must hear the

case *de novo* although, of course, the judgment of the trial court is accompanied by a presumption of correctness. Section 27-303, T.C.A.

In her declaration plaintiff alleged, in substance, that she purchased an electrically powered household freezer from defendant, that defendant delivered this appliance to her home and there installed same, that such delivery and installation were required by and done pursuant to the sales agreement, that defendant was negligent in its installation of the freezer, that a fire resulted from such negligence, and that her residence was damaged extensively by the fire. A plea of the general issue "not guilty" was filed by defendant. The parties stipulated that the amount of plaintiff's damages was $1,511.93.

Plaintiff assigns three errors. First, that the evidence preponderates against the judgment of the trial court; second, that the trial court erred in finding that plaintiff did not prove her case; and, third, that the trial court erred in finding plaintiff "contributorily negligent in her failure to change the defective installation."

The freezer in question was purchased by plaintiff from defendant in August, 1965. Defendant agreed not only to deliver the unit but to "hook it up." Delivery was made late one Saturday afternoon by two of defendant's employees, Calvin Cary and Hugh Ingram. Cary was defendant's service man. Although not an electrician he was an electrician helper, worked regularly with electricians and was familiar with "electricity and things of that kind." Ingram was Cary's helper but had little knowledge of electricity.

The freezer was installed in the utility room of plaintiff's home. Upon delivery it was found that the electrical

cord on this appliance was too short to permit its installation at the location desired by plaintiff. Cary then obtained from plaintiff a cord which plaintiff had in her household. Some of the witnesses described this cord as an extension cord, others called it a drop cord. In any case, this cord was connected to the cord on the freezer and together the cords were of sufficient length to reach from the desired location to the electrical outlet in the wall of the utility room.

It is quite clear that the cord obtained by Cary from plaintiff and used by him in the installation was too small to safely carry the electrical current required by the freezer. On direct examination Cary stated that this cord was sufficient to do the job and that he wouldn't have used it if he had "thought there would be any danger." But on cross-examination this witness testified as follows:

"Q Let me ask you this. Is it not a standard policy among your trade that, to absolutely prohibit the connection of a freezer or a refrigerator with an extension cord?

A Now, it is.

Q That's considered dangerous, isn't it—you are asking for trouble when you connect a freezer or a refrigerator with an extension cord?

A Yes.

Q Mr. Cary, you knew that this was absolutely not right. It was not a perfectly safe installation, because you said that you advised Mrs. Bell that it was going to be temporary?

A Yes."

The freezer ran continuously for some four or five days, then the utility room caught on fire—sometime after midnight. The Union City Fire Department was called and the firemen were able to extinguish the fire before it spread beyond the utility room. But the utility room was badly damaged. Mr. Charlie Quillin, Fire Chief and a member of the Fire Department for 27 years, investigated the fire. As to the cause of the fire, Chief Quillin testified:

"A The cord that was on the freezer wasn't long enough to reach the outlet and there was an extension cord used to run from the outlet to the end of the refrigerator and the extension cord was of a lighter type wire than was needed for the refrigerator.

Q Are you saying that the electric cord was the cause of the fire?

A Over-heated, yes."

Responding to a similar question from the trial judge, the Fire Chief stated:

"COURT: Did the wood along where the extension cord ran—did that wood char?

A Yes, it burned up those cabinets and things where the cord was underneath these cabinets. All those cabinets was destroyed."

Mr. Charlie Roberts, the city electrician, after the fire and at the request of plaintiff's counsel, examined the freezer and also some portions or remnants of the extension or drop cord. He stated that this cord was too small for the freezer. Asked what would happen if an electric motor is hooked up with a cord that is too small, this electrician answered:

"A It would cause it to heat * * * I have seen them get red hot.

Q You say you have seen wires get red hot?

A Yes.

Q Is it likely it might cause a flame if it gets hot enough?

A Yes."

As stated by U. S. District Judge Darr in Pierce v. United States, 142 F. Supp. 721 (affirmed 6 Cir., 235 F.2d 466), electricity has "traditionally been considered extremely dangerous and the duty of exercising a high degree of care is placed upon those dealing with it." In so holding, Judge Darr cited with approval Walpole v. Tennessee Light & Power Co., 19 Tenn. App. 352, 89 S.W.2d 174, and Tenn. Electric Power Co. v. Sims, 21 Tenn.App. 233, 108 S.W.2d 801. In view of the quoted testimony of the witness Cary and of the degree of care placed upon those dealing with electricity, we think it must be concluded that defendant was negligent in its installation of the freezer in that the extension or drop cord used was unsafe and dangerous. The record does not indicate that the trial court was of a different view. The trial judge, however, was not satisfied with the plaintiff's proof insofar as it related to the origin or cause of the fire and concluded that the fire was caused from "some really undetermined source" and that plaintiff, therefore, had not carried the burden of proof. We think the trial judge in so concluding failed to take into account the salutary rules announced in Everett v. Evans, 30 Tenn.App. 450, 207 S.W.2d 350; International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854; and Gable v. Tennessee Liquefied Gas Co., 45 Tenn.App. 674, 325 S.W.2d 657.

In the *Everett* case, Judge Felts said:

"A case may be made out by direct evidence, circumstantial evidence, or by a combination of direct and circumstantial evidence. If the evidence for plaintiff, together with all the reasonable inferences therefrom, made her theory more probable than any other, this was enough to take the case to the jury and to support the verdict. (Citing cases)

"But if the evidence for plaintiff, together with all such inferences therefrom, made her theory no more probable than the contrary of it; if such evidence and inferences left it a matter of equal probability whether plaintiff's injuries were caused by defendant's negligence or by some other cause for which he would not have been responsible; that is, if it was a matter of speculation and conjecture how the accident happened, then a verdict should have been directed for defendant." (Citing cases.)

In the *International Harvester Company* case, supra, Judge Swepston, while a member of this court, declared that the "rule that a jury may not speculate between two equally probable causes, for only one of which defendant is responsible, has no application where there is no substantial evidence of a sufficient cause or causes other than the negligence charged."

While the foregoing evidentiary rules were announced in jury cases, we perceive of no valid reason why they should not be applicable where, as here, the lower court and court of appeals are the triers of the facts. In this connection, it should be said that *Gable,* supra, was a non-jury case and in the opinion rendered in *Gable* these rules were cited with approval.

In the instant case we believe that plaintiff's evidence, which was both direct and circumstantial, together with all reasonable inferences to be drawn from such evidence, made her theory more probable than any other. Moreover, there was no evidence whatever that the fire which damaged plaintiff's home was caused by anything other than the inadequate extension or drop cord although, as will be shown, defendant insists that before the fire another cord of some kind had been substituted by plaintiff for the extension or drop cord used by defendant's employees in their installation of the appliance. Both parties seem to agree that the origin or cause of the fire was *an* inadequate and unsafe electrical cord.

■ We are of the view that the evidence in this case preponderates against the finding of the trial court that plaintiff did not prove her case; but there remains the question of whether plaintiff was guilty of proximate contributory negligence which would bar a recovery.

At the conclusion of the hearing, the trial judge indicated that plaintiff was contributorily negligent in failing to replace the extension or drop cord installed by defendant with a larger heavy duty cord. The lower court pointed out that the fire occurred four days after the installation and that "there was a period of time here which would tell the court that, if Mrs. Bell in this case had been told by the men who installed this appliance that something should be done about it, she would have had time to take some action in it if she felt it was necessary." The judge further observed that plaintiff knew more about the extension cord, how old it was, and how long it had been used, than anyone else.

■ The plaintiff in her testimony admits, in effect, that she knew that the installation was temporary. She

stated, however, that defendant's serviceman told her that the installation was all right for the time being and that "they didn't tell me to get another cord and they didn't say they would bring another cord. I thought they would fix it like it should be." Even if it be assumed that plaintiff was, in fact, told that she should get another cord, we do not agree that she was guilty of contributory negligence. There is nothing in the record to indicate that plaintiff had any more knowledge of electricity than the ordinary housewife. Cary himself testified that he told her that the use of her extension cord "would be all right" but that it would be "better" if she got a heavy cord. She had purchased an electrical appliance from a very reputable and nationally known retailer of electrical appliances and other consumer goods. She had the right to assume that defendant, with its vast and expert knowledge of electrical appliances, would not install the appliance in a manner which *created a fire hazard, whether such installation was temporary or permanent.*

The instant case is readily and easily distinguishable from the *Gable* case, supra. *Gable* involved an explosion in a building as a consequence of a leak in a valve on a gas floor furnace. The plaintiff was an electrician by trade and also a part-time plumber, and was well aware of the dangers involved. He nevertheless continued to use the gas furnace for a period of six weeks after he became aware of the leaking valve. This court held him guilty of contributory negligence and affirmed the judgment of the lower court dismissing his action. But here, as stated, the plaintiff is a housewife and here only four days elapsed between the defective installation and the fire.

Defendant's counsel ably and vigorously contends that the proof shows that before the fire plaintiff or someone

substituted another cord for the extension or drop cord used by defendant's employees. This contention is based on the testimony of certain witnesses that the initial extension or drop cord was black, whereas, the fire chief stated the cord which he examined after the fire was brown; and on further testimony that the location of the cord after the fire was not the same as its location when the freezer was installed. It is not surprising, we think, that there was some discrepancy among the witnesses as to the color of the cord. As to the change in its location, it may well be that the cord was moved in some manner by the efforts of the firemen to extinguish the blaze. The plaintiff testifies very positively, as does her daughter, that the electrical cord used initially in installing the freezer was not touched by anyone at any time prior to the fire. We have read and re-read the record in this case and we think the evidence tending to support defendant's cord substitution theory is not at all persuasive. Of considerable significance on this point is the fact the trial judge in his findings did not even mention the cord substitution matter. He talked only of plaintiff's *failure* to get another cord. Thus, it appears that, insofar as his contention of defendant is concerned, the trial judge took the same view of the evidence as we take.

For the reasons stated, we conclude that the evidence in this case preponderates against the judgment of the trial court. Plaintiff's assignments of error will accordingly be sustained and a judgment in the amount of $1,511.93 entered in favor of plaintiff. The costs, including the costs of this appeal, are taxed against defendant.

Carney and Bejach, JJ., concur.