IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 22, 2024 Session

## CARRIE M. THOMPSON v. STEPHEN MATTHEW THOMPSON

**Appeal from the Circuit Court for Rutherford County**
**No. 67169     B. Jo Atwood, Judge**

---

### No. M2023-00572-COA-R3-CV

---

Parents filed competing petitions to modify a parenting plan. The parents agreed there had been a material change in circumstances warranting a modification. But they disagreed over the residential custody schedule and decision-making provisions. After a hearing, the trial court modified the schedule and granted joint decision-making. Because neither decision was an abuse of discretion, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and JEFFREY USMAN, J., joined.

Jay B. Jackson, Murfreesboro, Tennessee, for the appellant, Carrie M. Thompson.

Heather G. Parker, Murfreesboro, Tennessee, for the appellee, Stephen Matthew Thompson.

**OPINION**

**I.**

**A.**

Carrie Thompson ("Mother") and Stephen Thompson ("Father") are the parents of one minor child, born in June 2013. For several years, they operated under a permanent parenting plan that named Mother primary residential parent and granted her 233 days of residential parenting time. Father received 132 days. Father petitioned to modify the residential custody schedule and to change Mother's sole medical decision-making to joint

decision-making. Mother responded with her own petition and proposed modified parenting plan.[1]

At trial, the court heard testimony from multiple witnesses. Proof revealed that the child's needs had evolved as he grew older and his school and extracurricular schedules changed. And his parents sometimes failed to communicate well or make parenting decisions together.

The court heard evidence that reflected poorly on each parent's communication with the other. Father testified that, one year, Mother waited so long to select her summer vacation dates that he was unable to take his allotted vacation. The next year, she waited to take summer vacation until after the child was back in school. And she did not accept Father's request for vacation time, characterizing it as a "refus[al] to bring [the child] back" and filed police reports. Mother also accused Father of failing to contribute toward the child's medical, school, and extracurricular bills. But she admitted she had never sent him receipts or asked for reimbursement. For his part, Father acknowledged that he did not respond to all of Mother's text messages or go to all the child's doctor appointments. And he admitted that he had called Mother a disrespectful term during an argument.

According to Father, Mother demanded strict adherence to the parenting plan. Because of this, she would not allow the child to stay for the dinners that Father's extended family had begun having at their farm on Sundays. Father testified that the child cried when he had to leave early. The child was close with his cousins who lived on the farm, as if they were "triplets." The children were all involved in helping with farm chores and playing together.

Under the parenting plan, Father could not bring the child to his landscaping business's work sites. And Mother did not want the child to play on an organized flag football team.[2] Father explained that once, while at a friend's house, he suddenly had to go to a job site, so he left the child in the care of that friend. The friend took the child to her son's flag football practice. Father's friend asked Father if the child could participate on the flag football team with her son, but Father said the child was not allowed.

Mother claimed to have photo evidence of the child doing just that. She explained that she had found the photos "off Facebook, off of [the City] Athletics" webpage. But the court concluded that "there [was] no authentication of the photos, explaining that "you can go pull anything off of Facebook; that doesn't make it real." Mother argued that identifying her son in the photos was sufficient for authentication purposes. But she could not provide any more information about when and where the photos were taken, who took the photos,

---

[1] Mother also sought to hold Father in civil contempt, which is not at issue on appeal.

[2] The parties had joint decision-making for extracurricular activities.

2

or if they accurately depicted the scene. So the court did not admit the photos into evidence. *See* TENN. R. EVID. 901. And Father testified that the child played in "zero" flag football games aside from "backyard football."

Father complained that he learned some important facts about the child only "through the court process." Both parents had been to some medical appointments regarding the child's ADHD diagnosis. But Mother did not notify Father before an appointment regarding starting the child on ADHD medication. Mother initially told the court that she "let [Father] know what had been discussed in that appointment" afterward. But after more questioning, she admitted she did not give "all the details": she did not tell Father that the doctor had prescribed medication to the child. Eventually, she admitted that, as of the day of trial, she still had not told Father that the child was prescribed ADHD medication. The court saw evidence of a document from the child's school that had a note stating, "Dad not on board for medication. School giving it on dad's parenting time." Mother explained that she had spoken with the school nurse about giving the child medication on those days.

Mother had few positive things to say about Father. She complained that she had "fel[t] pretty threatened" by him during an argument at a parenting exchange at a police station a few months before. When asked if Father threatened her with violence, she said, "He jumped out of his truck. . . . He started cursing me out." And she told the court that he "raised his hand at" her. When pressed further about the incident, she admitted that she had never previously brought the matter up, including during her deposition. Years before, she had accused Father of violence during a parenting exchange and made a criminal complaint. But she testified that she was "not really sure" what happened in that case and that she did not "remember what the actual ruling was."

B.

After considering the proof in light of the modification statute, the court entered a modified plan it found to be in the child's best interests. *See* Tenn. Code Ann. § 36-6-101(a)(2)(C) (2021). Both parents felt there had been a material change in circumstance since entry of the previous parenting plan, and the court agreed. *See id.* So the majority of the court's order focused on whether the statutory best interest factors weighed in favor of modification.

The court found several relevant factors weighed equally. Multiple witnesses testified to the child's strong bond with both Mother and Father. *See id.* § 36-6-106(a)(6) (Supp. 2024). And both parents were able to perform necessary parenting responsibilities. *See id.* § 36-6-106(a)(1). The court had some concerns about both parents' living arrangements, as neither had a written lease. Father rented from his landlord via a barter system, and Mother was dependent on her parents for housing. Still, "both parents ha[d] a

3

stable and satisfactory environment." *See id.* § 36-6-106(a)(10). And both parents' employment schedules allowed them time for parenting. *See id.* § 36-6-106(a)(14).

However, in the court's opinion, many other factors favored Father. Several witnesses testified to the child's close interactions with Father's extended family. *See id.* § 36-6-106(a)(9). On most of Father's custodial weekends, Father and the child went to the family farm, and on Sundays, the extended family gathered for dinner together. *See id.* Father's girlfriend helped prepare these dinners and helped the child with homework. *See id.* § 36-6-106(a)(12). Their relationship was "one of affection and love." *See id.*

Mother and her parents testified that the child participated in extracurricular activities and had a good relationship with his maternal grandparents as well. *See id.* § 36-6-106(a)(9). But Mother spent most of her testimony discussing "her perceived faults of the Father and the manner in which she expected the Father to parent and her criticism thereof." *See id.* § 36-6-106(a)(2), (9). When asked about what she would say about Father as a parent, her only comment was that Father "seems to be supportive of [the child] at ball games." And she had withheld information from Father about the child's ADHD medication. *See id.* § 36-6-106(a)(7).

The court had concerns about Mother's credibility regarding several issues. She had a "selective memory." She testified that Father had been abusive to her but provided no evidence "as to when the alleged abuse occurred or the manner of the alleged abuse." *See id.* § 36-6-106(a)(11). Father denied any abuse occurred. And Mother was "inconsistent and evasive in her testimony" in explaining her failure to share information about the child's ADHD medication with Father and why others believed that Father would not give the child medication of which he had no knowledge. *See id.* § 36-6-106(a)(2), (7).

Rather than adopting either Father's or Mother's proposed parenting plan, the court fashioned a plan it deemed in the child's best interest. It revised the residential schedule to grant Father parenting time "every other week from Thursday at 8:00 a.m. until Monday at 8:00 a.m. and on alternating weeks from Thursday at 8:00 a.m. until Saturday at 12:30 p.m." It added several provisions, including that "Father shall be allowed to take the minor child to his job sites." And it reallocated parental decision-making authority. *See id.* § 36-6-407(c) (2021). Because Mother "ha[d] not demonstrated the ability and desire to cooperate with the Father in decision making regarding the child's health care," the court changed her sole decision-making authority to joint decision-making authority. Mother moved to stay the order until the appellate process was complete, but the trial court ruled that the new parenting plan would go into effect.

4

## II.

Every final divorce decree involving minor children must include a permanent parenting plan. *Id.* § 36-6-404(a) (2021). Parents must comply with that plan unless they agree to a deviation or the plan is modified by the court. *Id.* § 36-6-405(b) (2021). When a parent petitions to modify a parenting plan, the trial court applies a two-step analysis. *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017); *Brunetz v. Brunetz*, 573 S.W.3d 173, 179 (Tenn. Ct. App. 2018). The threshold issue is whether a material change in circumstances has occurred since the court adopted the current parenting plan. Tenn. Code Ann. § 36-6-101(a)(2)(C). If a material change has occurred, the court then must examine the statutory best interest factors to determine whether modifying the parenting plan is in the child's best interest. *Brunetz*, 573 S.W.3d at 179; Tenn. Code Ann. § 36-6-106(a).

Whether a material change of circumstances has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). The parent seeking a modification has the burden of proving a material change by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(C). Here, the parents agreed that a material change had occurred, and the evidence supports such a finding. The child's schedule had changed as he grew older. The parents struggled to make parenting decisions together. And Mother's willingness to facilitate the child's relationship with Father was called into question by her failure to adhere to all terms of the parenting plan.

Whether modification of a parenting plan serves a child's best interest is also a question of fact. *In re T.C.D.*, 261 S.W.3d at 742. In evaluating best interest, the trial court is in a better position than a reviewing court to make certain judgments. *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). The trial court has "the opportunity to observe the witnesses" and is "better positioned to evaluate the facts." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing *Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)). Thus, we "presume that a trial court's factual findings on [best interest] are correct." *Armbrister*, 414 S.W.3d at 693; Tenn. R. App. P. 13(d). We do not overturn them unless the evidence preponderates against them. *Armbrister*, 414 S.W.3d at 693; *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006) (holding that, "[f]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect"). We give great weight to the trial court's determinations of witness credibility, which we do not overturn without clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

### A.

As a threshold matter, we consider whether the trial court's order complies with the mandate of Tennessee Rule of Civil Procedure 52.01 to "find the facts specially and . . . state separately its conclusions of law." Tenn. R. Civ. P. 52.01. Mother contends that

5

the trial court failed in this regard. In her view, the court's findings of fact were insufficient because "the trial court largely ignored significant testimony" and failed to "identify[] and consider[] all relevant facts."

The rationale underlying Rule 52.01 is that it "facilitates appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *In re Houston D.,* 660 S.W.3d 704, 721 (Tenn. Ct. App. 2022) (citing *Gooding v. Gooding,* 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015)) (internal quotation marks omitted). While "[t]here is no bright-line test for assessing the sufficiency of the trial court's factual findings," a trial court's findings generally "must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* It is not necessary for a court to discuss every fact separately "so long as [its] findings as a whole cover all relevant facts necessary to determination of the case." *Hodge v. Provident Life & Acc. Ins. Co.,* 664 S.W.2d 297, 300 (Tenn. Ct. App. 1983).

We conclude the court's order contains sufficient facts to disclose how the court reached its conclusions. *See In re Houston D.,* 660 S.W.3d at 721. The court included several paragraphs summarizing testimony that led it to conclude there had been a material change in circumstances. And it wrote approximately eleven pages of best interest analysis in which it cited each factor, explained whether the factor was applicable, summarized testimony relevant to the factor, and concluded whether the factor weighed in favor of one party or the other.

B.

According to Mother, the trial court also committed reversible error by excluding from evidence photos allegedly showing the child participating in flag football. A trial court's evidentiary decisions are reviewed for an abuse of discretion. *State v. Davis,* 466 S.W.3d 49, 61 (Tenn. 2015). A court abuses its discretion when it applies the wrong legal standard, reaches "an illogical or unreasonable decision," or bases its decision "on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher,* 312 S.W.3d 515, 524 (Tenn. 2010).

Tennessee Rule of Evidence 901 requires photos to be authenticated as a condition precedent to admission into evidence. TENN. R. EVID. 901. This requirement is satisfied "by evidence sufficient to the court to support a finding . . . that the [photo] in question is what its proponent claims." *Id.* One method of authentication is testimony of a witness with personal knowledge. TENN. R. EVID. 901(b)(1); *State v. Williams,* 913 S.W.2d 462, 465 (Tenn. 1996) (admitting photos when the victim of a crime testified that photos fairly and accurately represented the crime scene at which he was present).

6

Here, Mother submitted the photos for the purpose of demonstrating that Father violated the parenting plan's provision for joint extracurricular decision-making by allowing the child to participate in an organized flag football game without her approval. But she did not have personal knowledge of what the photos depicted, aside from her belief that her child was pictured. She had found the photos on a Facebook page. She did not provide any evidence to support that the photos were taken after entry of the parenting plan. She could not testify to the location of the photos or if the photos accurately depicted a scene at which she was not present. Without more, Mother's bare assertion that her child was in the photos was not "sufficient . . . to support a finding . . . that the [photo] in question is what [she] claims." TENN. R. EVID. 901(b)(1). We conclude the trial court did not abuse its discretion in denying admission of the photos.

## C.

Because a trial court has broad discretion to modify a parenting plan, a reviewing court should reverse the trial court's decision regarding the details of that plan only where the trial court has abused its discretion. *See Armbrister*, 414 S.W.3d at 693. Mother suggests that the court abused its discretion in weighing the best interest factors. *See* Tenn. Code Ann. § 36-6-106(a). In her view, the trial court "ignored largely positive testimony about Mother" and "completely ignored negative testimony about Father," causing it to draw conclusions unsupported by the evidence. Specifically, she alleges that the trial court erred in finding that any factors weighed in Father's favor. *See* Tenn. Code Ann. § 36-6-106(a)(2), (7), (9), (11), (12).

Mother contends that the evidence preponderates against the court's findings on three factors related to the child's relationship with family members. One factor considers each parent's willingness and ability to facilitate the child's relationship with the other parent. *Id.* § 36-6-106(a)(2). Another considers the child's interactions with relatives and involvement in his surroundings. *Id.* § 36-6-106(a)(9). The third considers how any other person who resides in or frequents a parent's home interacts with the child. *Id.* § 36-6-106(a)(12).

Based on our review of the record, the evidence does not preponderate against the trial court's findings on these factors. The child had close bonds with Father's extended family and spent most weekends with Father working and playing on the family farm. His relationship with Father's girlfriend was "one of affection and love." Father had positive things to say about Mother as a parent. By contrast, Mother spent the majority of her testimony complaining about Father. And evidence showed that she had refused to allow Father summer vacation time and had failed to disclose that medicine had been prescribed to the child. Mother asks this Court to reevaluate these factors in light of other considerations: she took the child to the doctor, tutoring, and church; sent Father photos of the child; bought the child clothes; and did homework with the child. But that is not our

7

role. And the trial court need not explicitly discuss every established fact in its best interest analysis. *See In re Houston D.,* 660 S.W.3d at 721; *Hodge,* 664 S.W.2d at 300.

Additionally, Mother contends that the court erred in its assessment of her credibility and application of that assessment to two more factors. *See* Tenn. Code Ann. § 36-6-106(a)(7), (11). The first of those factors considers the emotional and developmental needs of the child. *Id.* § 36-6-106(a)(7). The second considers physical or emotional abuse by a parent. *Id.* § 36-6-106(a)(11). Again, our review of the record provides no reason to overturn the trial court's credibility determination or its factual findings. During Mother's testimony, she first told the court that she "let [Father] know" about the appointment at which the child was prescribed medication. But, after more questioning, she revealed that she still had not told Father about the medication as of the day of trial. And she made an accusation at trial that Father had "raised his hand at her" and made her feel "threatened" during a parenting exchange, although she never mentioned the incident in discovery.

Mother complains that Father admitted he used inappropriate language with her during the parenting exchange argument. And Father could have "followed up with mother or asked any questions" about the appointment. But in determining the child's best interest, the court reviewed positive and negative evidence regarding both parents. It explained that Mother had "taken the greater responsibility for performing parental [tasks]," especially in the area of the child's health care. And the child had close relationships with his maternal grandparents, with whom he and Mother resided. It did not ignore negative testimony about Father. It found that Father could not effectively communicate with Mother. Still, the court was more concerned that Mother's testimony indicated that she may not possess the willingness or ability to encourage a loving relationship between the child and Father.

The court did not abuse its discretion in fashioning a modified parenting plan. Determining the child's best interest is a "particularly fact-intensive process." *McEvoy v. Brewer,* No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Best interest decisions "often hinge on subtle factors, including the parents' demeanor and credibility during the . . . proceedings." *Gaskill v. Gaskill,* 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The court applied the correct law, the evidence does not preponderate against its factual findings, and its decision is within the range of acceptable alternative dispositions. *See Lee Med., Inc.,* 312 S.W.3d at 524; *King v. Jones,* No. M2020-01252-COA-R3-CV, 2022 WL 2794347, at *6 (Tenn. Ct. App. July 18, 2022).

### D.

Father seeks to recover his attorney's fees on appeal under Tennessee Code Annotated § 36-5-103(c) (2021). This statute provides that "[a] prevailing party may recover reasonable attorney's fees" at the court's discretion. Tenn. Code Ann.

§ 36-5-103(c). Because Father prevailed on all issues, we find he is entitled to recover his attorney's fees incurred on appeal.

## III.

The trial court did not abuse its discretion in fashioning the modified parenting plan or in excluding certain photos from evidence. So we affirm. The case is remanded to the trial court to determine Father's reasonable attorney's fees incurred on appeal and for such further proceedings as may be necessary.

_____s/ W. Neal McBrayer_____
W. NEAL McBRAYER, JUDGE
